UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

APPLIED ENERGETICS, INC., a Delaware
Corporation,

          Plaintiff,

vs.

STEIN RISO MANTEL MCDONOUGH, LLP, a
New York Limited Liability Partnership,

          Defendant.

COMPLAINT

Civil Action No. _____

Jury Trial Demanded

Plaintiff Applied Energetics, Inc., by and through its counsel of record, as and for its complaint against defendant Stein Riso Mantel McDonough, LLP, alleges as follows:

## SUMMARY

1.     This case concerns the misconduct and breach of fiduciary duty and the standard of care by Stein Riso Mantel McDonough, LLP ("Stein Riso") in its representation of Applied Energetics, Inc. ("AE") from 2016 to 2018.  During the time that Stein Riso was engaged as counsel for AE, Stein Riso advised, assisted, and encouraged George Farley ("Farley"), AE's former CEO, in his improper issuance of 63 million shares of AE stock at significantly below fair market price, including 25 million shares to Farley himself and 10 million shares issued directly to Stein Riso.

2.     Furthermore, both Stein Riso and Farley – with Stein Riso's counsel, assistance and encouragement – failed to seek or obtain proper valuations of AE's stock price and repeatedly ignored facts demonstrating that the true value was higher than the par value at which Farley ultimately issued the stock.  Stein Riso also repeatedly failed to advise Farley that each such share issuance was in direct violation of AE's bylaws.

3.     As demonstrated herein, each of these acts constituted a breach of Stein Riso's fiduciary duty to AE.  Accordingly, in presently ongoing litigation between AE and Farley, the Delaware Court of Chancery recently granted a preliminary injunction preventing Farley's sale

of his own shares based in part on a finding that Farley likely breached his fiduciary duty to AE *by engaging in the same conduct materially assisted by Stein Riso in the instant action*.

4.      Moreover, by its acceptance of 10 million shares of AE stock for $10,000 worth of services, without obtaining an independent valuation, Stein Riso violated New York Rule of Professional Conduct 1.8, which allows AE to void the transaction.  AE previously elected to void the transaction but Stein Riso has not returned the 10 million shares.

5.      Via this lawsuit, AE seeks the return of the 10 million shares improperly issued to Stein Riso as well as monetary damages for the losses AE has suffered as a result of the improper issuance of its stock to Farley and other third parties, dilution of the value of subsequently issued stock, the legal fees and costs incurred in attempting to remedy the improper stock issuances, and the business and fundraising opportunities lost as a result of the improper stock issuance and the ensuing litigation.

## PARTIES

6.      Plaintiff AE is a corporation organized under the laws of the State of Delaware with its principal place of business in Tucson, Arizona.

7.      Stein Riso is a limited liability partnership formed under the laws of the State of New York with a registered address in New York, New York.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between AE and Stein Riso and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(c)(2) because Stein Riso is subject to this Court's personal jurisdiction.

## STATEMENT OF FACTS

**A.  Farley Retains Stein Riso on Behalf of AE and Agrees to Pay in AE Stock**

10.     Stein Riso entered into a retainer agreement with AE to provide legal services via letter dated February 4, 2016 and signed by Farley on February 9, 2016.  A copy of the retainer letter is attached hereto as Exhibit 1.

11.     The retainer letter provided that the scope of the retainer was for "general business and tax matters" and "such other matters which you may refer to us from time to time," but excluding "any matters involving your responsibilities under Federal or state securities laws."  The retainer letter further required payment of bills within 30 days of receipt and made no mention of receiving shares in lieu of cash.

12.     Notwithstanding this fact, Farley, on behalf of AE, negotiated with Dennis Stein ("Stein"), a partner of Stein Riso, an agreement to pay for $5,000 worth of Stein Riso's legal services via the payment of AE stock.  Stein Riso attorney Ivan Dreyer ("Dreyer") prepared a Common Stock Subscription Agreement and emailed it to Farley on February 9, 2016.  A copy is attached hereto as Exhibit 2.

13.     The February 9, 2016 draft subscription agreement set the price at which the shares would be purchased at $.001 per share, the same as par value.  No basis for this valuation was provided in the subscription agreement or in any prior written correspondence between Stein Riso and AE.

14.     At the time of this exchange, Stein Riso did not advise AE to consult independent legal counsel to review the subscription agreement and did not obtain written acknowledgement or waiver of this potential conflict from AE.

15.     The same day, February 9, 2016, Farley emailed Stein Riso a copy of AE's Board of Directors minutes purporting to authorize share issuances to "SRMM and others."  A copy is attached hereto as Exhibit 3.

16.     The draft minutes Farley sent to Stein Riso were dated February 10, 2016 and contained two signature lines for AE directors, prompting Dreyer to inquire whether there were other AE board members and to advise that the minutes should address the price of the shares,

3

the number of shares being issued, and the specific recipients.  A copy of Dreyer's email is attached hereto as Exhibit 4.

17.     Farley responded to Dreyer, informing him that he was the only AE director. With respect to the stock price and list of recipients, Farley responded, "I can use par value as the price per share since it approximates FMV.  Will insert the names of the recipients and number of shares."

18.     Beyond this email exchange with Farley, upon information and belief, Stein Riso did not investigate whether accepting AE shares at par value was fair to AE and its shareholders.

19.     Upon information and belief, Stein Riso did not engage the services of an investment professional to value AE's shares, and knew that Farley had not obtained any such independent advice.

20.     At the time of the February 9 and 10, 2016 email exchanges between Farley and Stein Riso, AE's stock was traded publicly.  The closing prices as of February 9 and 10, 2016 were $.0036 and $.0044 respectively – approximately four times higher than par value of $.001.

21.     Farley sent an email to Stein and Dreyer on February 12, 2016 attaching draft AE Board of Directors minutes, which provided that AE was engaging Chris Rahne ("Rahne") to provide valuation services, and further, that that AE had or was going to enter into agreements with Steven McCahon ("McCahon") for technical services and Stephen McCommon ("McCommon") for accounting services in exchange for 20 million and 2 million AE shares, respectively, again all at $.001 per share.  A copy of Farley's February 12, 2016 email is attached hereto as Exhibit 5.

22.     The February 12, 2016 draft AE Board of Directors minutes doubled the shares granted to Stein Riso, from the 5 million originally agreed upon to 10 million, without explanation.

23.     Without waiting for Rahne's valuation of AE's stock, and without independently investigating the value of the stock, Stein Riso executed its subscription agreement for 10 million AE shares at $.001 per share on February 16, 2016.  A copy of the subscription agreement is attached hereto as Exhibit 6.

24.     The executed subscription agreement did not contain anything indicating that par value was a fair price for the shares, that AE was advised to consult with an independent attorney, or that AE gave its written informed consent of the possibility of a conflict with respect to the transaction.

**B.  Stein Riso Fails to Properly Advise Farley and AE of Their Legal Obligations**

25.     Effective February 10, 2016, AE's only director other than Farley, John Levy, resigned from his position, leaving Farley as the only director.  Farley informed Stein Riso as much when Dreyer inquired in response to the February 10, 2016 draft Board of Directors minutes.

26.     Farley informed Stein Riso, through the February 12, 2016 draft AE Board of Directors minutes, that he intended to issue 20 million shares of AE stock to himself, 20 million shares to McCahon, 2 million shares to McCommon, and 1 million shares to Rahne, in addition to the 10 million shares to Stein Riso, all for $.001 per share.

27.     Stein Riso assisted Farley in carrying out Farley's intended stock issuances by consenting to Farley utilizing Stein Riso's form subscription agreement for the additional issuances and by reviewing and revising the draft Board of Directors minutes authorizing the issuances.

28.     Farley ultimately used the form subscription agreement prepared by Stein Riso to issue tens of millions of shares to several third parties, all at $.001 per share, which shares would total more than one-half of AE's pre-dilution equity.

29.     On February 16, 2016, the same day that Stein Riso executed the subscription agreement, Farley sent an email to Stein Riso which included his written consent, as AE's lone director, to make the issuances contemplated by the draft Board of Directors minutes: 20 million shares to Farley personally, 10 million shares to Stein Riso, 20 million shares to McCahon, 2 million shares to McCommon, and 1 million shares to Rahne.  A copy of Farley's February 16, 2016 email is attached hereto as Exhibit 7.

30.     Also included in Farley's February 16, 2016 email was an executed "unanimous" agreement from AE, signed only by Farley, granting Farley – personally – 5 million shares under AE's 2004 Stock Incentive Plan.

31.     By virtue of its knowledge that Farley was the lone director of AE, Stein Riso also knew that AE's issuances of stock to Farley constituted self-interested transactions and were therefore subject to Delaware's conflict of interest statute.

32.     Stein Riso did not advise Farley or AE of the conflict of interest problem the AE-Farley transactions presented.

33.     Stein Riso did not advise AE to seek and obtain an independent valuation before determining the stock issuance price, to seek the approval of the disinterested shareholders for the stock issuance, to seek to appoint or hold a shareholder vote to elect independent directors to the two then-vacant board seats to review the proposed stock issuance to Farley, or expend any additional effort to determine whether 1/4 of the AE's pre-dilution equity was being issued to Farley at a fair price.

34.     Stein Riso also failed to advise AE that if the approval of disinterested directors and shareholders was not obtained, the transaction would need to be completely fair to AE, which would require, at a minimum, a disinterested valuation of the shares being issued to Farley.  Instead, Stein Riso opted to stay silent on these basics of corporate governance and actively assisted Farley in raiding AE's equity, itself a major beneficiary.

35.     Stein Riso failed to inform AE that an evaluation performed by Rahne, who had a financial interest in the valuation of AE's stock by virtue of his own issuance, would not be "disinterested."

36.     Pursuant to AE's bylaws, Board of Directors actions may be taken only by a majority vote of a three-member board.  This requirement was in effect during February and March 2016.

37.     Stein Riso did not inform AE that AE's bylaws did not allow Farley to approve stock issuances, nor did it inform AE at any point that the issuances Farley had contemplated and approved were potentially invalid.

6

**C. Stein Riso Continues to Aid and Abet Farley's Malfeasance**

38.     On February 19, 2016, Farley requested that Stein Riso prepare a legal opinion letter regarding the 5 million shares he had decided to issue to himself.  Dreyer declined to do so initially, noting that Stein Riso could not provide legal services regarding securities under the retainer agreement.  A copy of the email exchange between Farley and Dreyer is attached hereto as Exhibit 8.

39.     On February 23, 2016, Dreyer emailed Farley draft amendments to AE's charter which increased the number of authorized shares to 500 million from 125 million.  This increase was necessary to effectuate the various share issuances Farley was planning, including those to himself and to Stein Riso, because AE's charter did not allow for the issuance of another 63 million shares of stock.  A copy of the draft amendments is attached hereto as Exhibit 9.

40.     On March 1, 2016, Farley emailed Stein and Dreyer regarding AE issuing 10 million shares to Stein Riso.  A copy of Farley's email is attached hereto as Exhibit 10.  Farley stated that AE would require Stein Riso to issue a legal opinion that the shares are authorized and that the legend on the shares is correct.  Dreyer noted that it would be inappropriate for Stein Riso to issue an opinion relating to shares it was to receive.  A copy of Dreyer's email is attached hereto as Exhibit 11.

41.     Notwithstanding his assertion, Dreyer issued the requested opinion both for the 10 million shares issued to Stein Riso and also 20 million shares issued to Farley.  A copy of the opinion is attached hereto as Exhibit 12.

42.     Prior to issuing this opinion, Stein Riso received and analyzed March 11, 2016 minutes from AE, which authorized AE to negotiate with Rahne for valuation services; however, no valuation had been received from Rahne.  A copy of the March 11, 2016 Board of Directors meeting minutes is attached hereto as Exhibit 13.  The minutes also indicated Farley's intent to issue another 5 million AE shares to "Dunn, Bornsen & Fettig, LLP" ("Duft Bornsen") at $.001 per share.

43.     On March 15, 2016, Dreyer emailed Farley concerning subscription agreements for Rahne, McCahon, Duft Bornsen, and Farley.  A copy of Farley's email is attached hereto as Exhibit 14.  Stein Riso reviewed the subscription agreements for AE.

44.     In reviewing the subscriptions, Dreyer specifically informed Farley that "if services (as opposed to cash) are intended to constitute the subscriber's payment for the stock, such services must have been rendered prior to the issuance of the stock and must have reached a value equal to the stated purchase price."

45.     In response, Farley stated that AE is accruing fees for McCahon that exceed the purchase price of the stock and that AE is accruing fees of $12,500 per month for Farley's services, both of which exceed the total value of the subscription.  A copy of Farley's email is attached hereto as Exhibit 15.

46.     On April 26, 2016, Farley arranged, with Stein Riso's assistance, to transfer 20 million of his newly-issued shares to AnneMarieCo. LLC, an entity owned and controlled by Farley's immediate family members, including Farley's wife.

**D. Stein Riso Benefits from Inside Information**

47.     On March 21, 2016, AE filed a Form 8-K with the SEC indicating it had filed a certificate of amendment to its Certificate of Incorporation increasing its authorized common stock from 125,000,000 to 500,000,000, which amendment Stein Riso had prepared and sent to Farley on February 23, 2016.  As of March 22, 2016, AE's stock closed at $.0055.

48.     At the time that Stein Riso subscribed for 10 million shares, AE was in the process of restarting its business operations, including the agreement with McCahon to restart research operations and the preparation of a new partnership investment, both of which facts were known to Stein Riso but were not publicly disclosed.

49.     On March 30, 2016, AE filed its Form 10-K with the SEC wherein it disclosed, among other things, "The company is planning to reactivate its previous business activities pursuant to Teaming and Consulting Agreements with Applied Optical Sciences, Inc. ("AOS") and Dr. Stephen W. McCahon, Ph.D., one of the company's founders and owner of AOS who

was primarily responsible for development of the Company's existing Intellectual Property portfolio (collectively the "Consultants")."

50.     On March 31, 2016, with a volume of 1,449,139 shares traded, AE's stock closed at $.012.  Two trading days later, on April 4, 2016, AE's stock closed at $.04, or *forty times* the price Stein Riso had "paid" for its 10 million AE shares.

51.     Upon information and belief, Stein Riso was aware no later than February 12, 2016 that McCahon would contract with AE to restart AE's research and development activities, which would foreseeably dramatically increase AE's market price.

52.     Though it is dated February 9, 2016, Stein Riso did not finalize its subscription agreement with AE until February 16, 2016, *after* it learned of this material non-public information.  Stein Riso's actions ensured that it was able to purchase AE's shares before the market reacted to the announcement of AE's resumption of business activities.

### E.  Stein Riso Belatedly Receives a Fraudulent Valuation of AE's Shares

53.     On April 28, 2016, Stein Riso received an email sent by Farley to Rahne.  In the email, Farley requested a retroactive valuation, noting that the company "has recently issued 63 million shares" and stated that he thought he could use "fair value rather than quoted trading prices."  A copy of the email is attached hereto as Exhibit 16.

54.     On September 13, 2016, Stein Riso learned, via receiving an email from Farley, that Superius Securities Group, Inc., a shareholder in AE, was challenging the stock issuances authorized by Farley.  In an internal Stein Riso email from Dreyer to Stein dated November 17, 2016, Dreyer wrote that in order to investigate whether the issuance of AE shares at $.001 per share were proper, he had "discussions with both George Farley and Dennis concerning the board's basis for establishing the subscription price and was told that it was based both on the price at which the stock had traded and on the opinion of an appraiser."  A copy of the email is attached hereto as Exhibit 17.

55.     Upon information and belief, at the time Stein Riso executed its subscription agreement with AE and received its 10 million shares, Stein Riso had neither obtained the opinion of an appraiser nor ever checked the public trading price for AE's shares.

56.     On November 17, 2016, Stein Riso received the first drafts of Rahne's valuation. A copy of the November 17, 2016 email including Rahne's first draft valuation is attached hereto as Exhibit 18.

57.     Prior to receiving the final version of the Rahne valuation, upon information and belief, Stein Riso was aware that Farley had personally interfered with the valuation by suggesting multiple times that Rahne make changes to it.

58.     Stein Riso received the final valuation from Rahne on January 23, 2017, almost a full year after AE and Stein Riso used par value as fair market value to issue approximately two-thirds of AE's pre-dilution equity.   A copy of the final Rahne valuation is attached hereto as Exhibit 19.

**F.  Stein Riso Bills – And Overbills – AE**

59.     On March 3, 2016, Stein Riso issued its first bill to AE.   The bill total was $11,585.13 but deducted a $10,000 credit for "Agreed credit to client in exchange for the issuance to the firm of clients shares of common stock."

60.     Stein Riso's bills show that it acted affirmatively in aiding and abetting Farley's misconduct, including entries such as:

      a.  Preparing the subscription agreements giving roughly two-thirds of AE's equity to various individuals at the lowest legally-possible value of $.001;

      b.  Preparing and filing the amendment to AE's articles that made Farley's self-dealing possible;

      c.  Reviewing and commenting on each director resolution authorizing Farley to issue the shares;

      d.  Issuing legal opinions to AE's transfer agent in connection with each stock issuance; and

      e.  Reviewing and advising Farley in connection with finalizing each subscription agreement, including the formalities associated with the stock issuances thereunder;

61.     Stein Riso also billed hours on securities matters, including a three-hour phone call "with a securities specialist," despite the fact that the retainer agreement specifically prohibited Stein Riso from providing legal services relating to securities.

62.     Stein Riso's bills also contain several errors and improper charges, such as:

a.  Billing AE for work done on "Alissa Pharmaceutical," which has nothing to do with AE;

b.  Billing AE for preparing and reviewing its own legal opinion for the stock that was transferred to Stein Riso;

c.  Billing AE for errors it made in preparing the Delaware charter amendment;

d.  Billing AE to review Stein Riso's own Schedule 13-D filing; and

e.  Billing AE to assist Farley personally in transferring his shares to AnneMarieCo, a family limited liability company, of no benefit to AE.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty)

63.     AE incorporates by reference each of the preceding allegations as if set forth herein.

64.     Stein Riso was retained as attorneys for AE.

65.     As AE's attorneys, Stein Riso owed AE fiduciary duties of the utmost good faith.

66.     Stein Riso was not attorneys for, and did not owe fiduciary duties to, Farley personally.

67.     Pursuant to its fiduciary duty, Stein Riso was obligated to exercise the highest degree of good faith, honesty, integrity, fairness, and fidelity.

68.     Pursuant to its fiduciary duty, Stein Riso was required to protect AE from liability in every possible way.

69.     Pursuant to its fiduciary duty, Stein Riso was required to advise AE of the legality of its actions.

70.     Pursuant to its fiduciary duty, Stein Riso was required to help AE avoid wrongdoing.

71.     Pursuant to its fiduciary duty, Stein Riso was required to discuss with AE any of AE's conduct that was violative of laws or regulations, to urge cessation of such conduct, and to withdraw from representation rather than aid in the continuation of such conduct.

72.     Pursuant to its fiduciary duty, Stein Riso was required to place AE's interest above its own.

73.     Pursuant to its fiduciary duty, Stein Riso was prohibited from engaging in an interested transaction which is not entirely fair to AE.

74.     Pursuant to its fiduciary duty, Stein Riso was prohibited from profiting from the use of confidential corporate information.

75.     Stein Riso breached its fiduciary duty to AE by, among other acts and omissions:

a.  Failing to investigate whether par value of $.001 per share was the fair market value for AE common stock when Farley issued – with Stein Riso's assistance – more than two-thirds of AE's pre-dilution equity, 25 million of those shares to Farley and 10 million to Stein Riso.

b.  Assisting Farley issue tens of millions of shares of AE Common Stock to third parties at par value, which was a fraction of the shares' true value.

c.  Failing to advise Farley that issuing 25 million shares to himself as AE's sole officer or director was self-dealing and needed to be approved by disinterested directors, disinterested shareholders, or else be entirely fair to AE.

d.  Failing to investigate whether Farley's issuance of 25 million AE shares to himself was entirely fair to AE.

e.  Failing to inform and advise AE of the nature and effect of the McCahon, Rahne, McCommon, and Fettig stock subscription agreements.  While Stein Riso did inform AE that services must be rendered beforehand, with respect to Fettig and Rahne, the shares were issued before they provided services to AE.

f.  Failing to inform AE that it would be inappropriate to issue approximately 63 million shares of AE common stock – approximately two-thirds of the pre-diluted equity – at $.001 per share without first receiving an independent valuation, yet

materially assisting Farley issue those shares knowing no such independent valuation had been obtained.

g. Failing to advise AE that it would be inappropriate for AE to pay for the Rahne valuation in the very shares Rahne was valuing.

h. Failing to advise AE that it would be inappropriate to set the price of the shares in the agreement hiring Rahne to value the shares.

i. Failing to inform and advise AE of the nature and effect of AE's bylaws on Farley's ability to take actions on behalf of AE.

j. Failing to inform and advise AE that Farley was unable to issue stock without additional directors being added to the Board.

k. Knowingly providing and billing AE for legal services relating to securities matters when securities issues were specifically excluded from the retainer agreement.

l. Charging AE for Stein Riso's provision of legal advice to Farley personally.

m. Billing AE to review Stein Riso's own 13-D filing.

n. Agreeing to "buy" AE shares in possession of material non-public information, including AE's plan to restart its business and consulting agreement with McCahon.

o. Repeatedly ignoring facts demonstrating AE common shares were worth substantially more than the par value price at which Farley and Stein Riso were providing for more than two-thirds of AE's pre-dilution value.

p. Failing to ever check the public market price for AE shares which would have indicated that at all relevant times, AE was trading at multiple times the price at which AE and Stein Riso were giving the shares away and had never traded at $.001 or lower.

q. Alternatively, if Stein Riso ever did check the public trading price of AE's shares, they failed to ever mention, discuss or advise AE that issuing 63 million shares at ¼ the public trading price would violate Farley's fiduciary duties to AE.

76.     None of the above-alleged breaches of Stein Riso's fiduciary duty was approved by a majority of AE's disinterested directors because none existed at the time.

77.     None of the above-alleged breaches of Stein Riso's fiduciary duty was approved by a majority of AE's disinterested shareholders.

78.     As a direct and proximate result of each of the above-alleged breaches of Stein Riso's fiduciary duty, AE's stock is severely diluted.

79.     As a direct and proximate result of each of the above-alleged breaches of Stein Riso's fiduciary duty, AE has been deprived of the fair value of the stock that was improperly issued.

80.     As a direct and proximate result of each of the above-alleged breaches of Stein Riso's fiduciary duty, AE has been required to engage in costly litigation against Farley, incurring attorneys' fees and costs.

81.     As a direct and proximate result of each of the above-alleged breaches of Stein Riso's fiduciary duty, AE has been required to raise capital via selling shares at below their true value because of the dilution that Stein Riso's breaches of its fiduciary duties caused.

82.     As a direct and proximate result of each of the above-alleged breaches of Stein Riso's fiduciary duty, AE has been required to engage in costly litigation against Farley, which has deprived AE of business and fundraising opportunities, and distracted its management and executives' time and efforts away from such business and fundraising efforts.

## SECOND CAUSE OF ACTION

### (Legal Malpractice)

83.     AE incorporates by reference each of the preceding allegations as if set forth herein.

84.     As AE's attorney, Stein Riso owed AE a duty to exercise that degree of care, skill, and diligence commonly possessed and exercised by members of the legal community.

85. Stein Riso failed to exercise that degree of care, skill, and diligence commonly possessed and exercised by members of the legal community in its representation of AE concerning its stock issuances of 63 million shares at $.001 per share, described above. No reasonable attorney would determine that it was appropriate to:

    a. fail to investigate whether par value of $.001 per share was the fair market value for AE common stock when Farley issued – with Stein Riso's assistance – 63 million shares of AE treasury stock, more than two-thirds of AE's pre-dilution equity, 25 million of those shares to Farley and 10 million to Stein Riso;

    b. assist Farley in issuing 63 million shares of AE Common Stock to third parties at par value, which was a fraction of the shares' true value;

    c. fail to advise Farley that issuing 25 million shares to himself as AE's sole officer or director was self-dealing and needed to be approved by disinterested directors, disinterested shareholders, or else be entirely fair to AE;

    d. fail to investigate whether Farley's issuance of 25 million AE shares to himself was entirely fair to AE;

    e. fail to inform and advise AE of the nature and effect of the McCahon, Rahne, McCommon, and Fettig stock subscription agreements;

    f. fail to inform AE that it would be inappropriate to issue approximately 63 million shares of AE common stock – approximately two-thirds of the pre-diluted equity – at $.001 per share without first receiving an independent valuation, yet materially assist Farley issue those shares knowing no such independent valuation had been obtained;

    g. fail to advise AE that it would be inappropriate for AE to pay for the Rahne valuation in the very shares Rahne was valuing;

    h. fail to advise AE that it would be inappropriate to set the price of the shares in the agreement hiring Rahne to value the shares;

    i. fail to inform and advise AE of the nature and effect of AE's bylaws on Farley's ability to take actions on behalf of AE;

j.   fail to inform and advise AE that Farley was unable to issue stock without additional directors being added to the Board;

k.   knowingly provide and bill AE for legal services relating to securities matters when securities issues were specifically excluded from the retainer agreement.

l.   charge AE for Stein Riso's provision of legal advice to Farley personally.

m.   bill AE to review Stein Riso's own 13-D filing;

n.   agree to "buy" AE shares in possession of material non-public information, including AE's plan to restart its business and consulting agreement with McCahon;

o.   repeatedly ignore facts demonstrating AE common shares were worth substantially more than the par value price at which Farley and Stein Riso were providing for more than two-thirds of AE's pre-dilution value;

p.   fail to ever check the public market price for AE shares which would have indicated that at all relevant times, AE was trading at multiple times the price at which AE and Stein Riso were giving the shares away and had never traded at $.001 or lower;

q.   alternatively, if Stein Riso ever did check the public trading price of AE's shares, they failed to ever mention, discuss or advise AE that issuing 63 million shares at ¼ the public trading price would violate Farley's fiduciary duties to AE.

86.   As a direct and proximate result of Stein Riso's failure to exercise the degree of care, skill, and diligence commonly possessed and exercised by members of the legal community, AE's stock is severely diluted.

87.   As a direct and proximate result of Stein Riso's failure to exercise the degree of care, skill, and diligence commonly possessed and exercised by members of the legal community, AE has been deprived of the fair value of the stock that was improperly issued.

88.   As a direct and proximate result of Stein Riso's failure to exercise the degree of care, skill, and diligence commonly possessed and exercised by members of the legal

community, AE has been required to engage in costly litigation against Farley, incurring attorneys' fees and costs.

89.     As a direct and proximate result of each of Stein Riso's failure to exercise the degree of care, skill, and diligence commonly possessed and exercised by members of the legal community, AE has been required to raise capital via selling shares at below their true value.

90.     As a direct and proximate result of Stein Riso's failure to exercise the degree of care, skill, and diligence commonly possessed and exercised by members of the legal community, AE has been required to engage in costly litigation against Farley, which has deprived AE of business and fundraising opportunities.

### THIRD CAUSE OF ACTION

**(Aiding and Abetting Breach of Fiduciary Duty)**

91.     AE incorporates by reference each of the preceding allegations as if set forth herein.

92.     At all relevant times, Farley owed fiduciary duties of care and loyalty to AE.  At all relevant times, Stein Riso knew Farley owed these fiduciary duties to AE.

93.     Farley breached his fiduciary duties to AE by, among other things, engaging in self-dealing and self-interested transactions that were not entirely fair to AE and with the knowledge of material non-public information, failing to comply with AE's bylaws, issuing stock to third parties, including Stein Riso, at par value despite fair market value and the publicly trading value being significantly higher, and failing to obtain independent valuation of AE's shares before issuing the foregoing stock.

94.     Stein Riso knowingly participated in Farley's breaches of his fiduciary duties by:

    a.  knowingly providing the forms and legal work Farley used to issue stock at par value to himself and others.

    b.  knowingly preparing, reviewing and commenting on the documents Farley needed to consummate the transactions that constituted his breach of fiduciary duty.

    c.   assisting Farley with AE's issuances of stock despite knowing that no valuation had been performed on the shares and that $.001 was the par value and lowest legally-possible price for the shares to be issued.

    d.   assisting Farley with Farley's transfer of stock to AnneMarieCo, LLC, in an effort to avoid Farley's personal liability for having improperly obtained the stock.

    e.   Performing these acts, and all of them, with the knowledge that the stock issuances and transfers carried out by Farley were completed in breach of Farley's fiduciary duties to AE.

95.    By each of the above-alleged acts, Stein Riso gave Farley substantial assistance in carrying out Farley's breach of his fiduciary duties to AE.

96.    As a direct and proximate result of Farley's breach of fiduciary duty, AE's stock is severely diluted.

97.    As a direct and proximate result of Farley's breach of fiduciary duty, AE has been deprived of the fair value of the stock that was improperly issued.

98.    As a direct and proximate result of Farley's breach of fiduciary duty, AE has been required to engage in costly litigation against Farley, incurring attorneys' fees and costs.

99.    As a direct and proximate result of Farley's breach of fiduciary duty, AE has been required to engage in costly litigation against Farley, which has deprived AE of business and fundraising opportunities.

## FOURTH CAUSE OF ACTION

### (Voidance of Fee Under New York Rule of Professional Conduct 1.8)

100.    AE incorporates by reference each of the preceding allegations as if set forth herein.

101.    Stein Riso served as AE's attorneys pursuant to a retainer agreement.

102.    As attorneys, Stein Riso was bound to follow New York Rule of Professional Conduct 1.8.

103.     Stein Riso had a duty not to enter into a business transaction with a client, including accepting securities as payment, unless the transaction is fair and reasonable; the client is advised in writing of seeking and is given a reasonable opportunity to seek, the advice of independent legal counsel; and the client gives informed written consent as to the essential terms of the transaction and the lawyer's role in the transaction.

104.     Stein Riso had a duty to determine the value of any securities it was granted in lieu of fees before accepting such securities.

105.     Stein Riso agreed to accept shares of AE as payment for its work on behalf of AE.

106.     Stein Riso did not obtain a valuation of AEs shares prior to accepting them.

107.     Stein Riso did not ascertain the market price of AE stock prior to accepting them.

108.     Stein Riso only received the Rahne valuation nearly an entire year after accepting AE's shares as payment at par value.  Even then, Stein Riso knew that the Rahne valuation was not independent or impartial.

109.     Stein Riso did not ensure the issuance of AE shares to Stein Riso at par value was fair and reasonable to AE and AE's shareholders.

110.     Stein Riso did not advise AE in writing to seek independent legal counsel.

111.     Stein Riso did not obtain informed written consent to the essential terms of AE's issuance of AE shares to Stein Riso at par value, such as the advisability of obtaining independent valuation services.

112.     Stein Riso prepared the subscription agreement which issued AE stock to itself at par value.

113.     Stein Riso's conduct was in violation of New York Rule of Professional Conduct 1.8.

114.     Violations of New York Rule of Professional Conduct 1.8 permit the client to void the transaction.

115.     As a result of Stein Riso's violation of New York Rule of Professional Conduct 1.8, AE elects to void the stock issuance to Stein Riso.

## FIFTH CAUSE OF ACTION

### (Violation of New York Rule of Professional Conduct 1.5)

116.     AE incorporates by reference each of the preceding allegations as if set forth herein.

117.     Stein Riso served as AE's attorneys pursuant to a retainer agreement.

118.     As attorneys, Stein Riso was bound to follow New York Rule of Professional Conduct 1.5.

119.     Stein Riso had a duty not to charge AE excessive fees for its work.

120.     Stein Riso received 10 million shares of AE stock in exchange for the work it performed for AE.

121.     Such shares were issued at par value, $.001 per share, therefore, Stein Riso agreed to perform the work for $10,000 of value.

122.     At the time Stein Riso agreed to accept AE shares as payment, Stein Riso was aware of material non-public information which foreseeably caused AE's share price to rise.

123.     Two months after Stein Riso accepted AE shares as payment at $.001 per share, it assisted Farley in transferring his own shares to AnneMarieCo, LLC at a value of $.04 per share.

124.     Using this valuation, Stein Riso received $400,000 worth of AE shares in exchange for an agreed-upon $10,000 worth of services.

125.     Stein Riso claims to be owed an additional $54,120.67 by AE, a portion of which is for work done for other clients or which was not permitted by the retainer agreement between Stein Riso and AE.

126.     $454,120.67 is an excessive fee for $10,000 worth of work.

127.     As a result of Stein Riso's violation of New York Rule of Professional Conduct 1.5, Stein Riso must return the excessive fees to AE.

## SIXTH CAUSE OF ACTION

### (Securities Fraud)

128.     AE incorporates by reference each of the preceding allegations as if set forth herein.

129.    At the time that Stein Riso agreed to receive AE shares at par value as payment for its services, Stein Riso was in possession of material non-public information about AE's plans to restart its business operations, exit shell status, and enter into agreements with McCahon and AOS, which information Stein Riso received because of its position as AE's attorneys.

130.    This information was treated as confidential by AE and was not made public until months later.

131.    Stein Riso knew or was reckless in not knowing that the information it possessed and traded on was material and non-public, and that it owed AE and its shareholders a fiduciary duty of care and loyalty to keep this information confidential and to refrain from trading on it.

132.    Stein Riso breached a fiduciary duty, or a similar duty of trust and confidence to AE, by trading on the basis of material non-public information it obtained through its representation or prospective representation of AE.

133.    By engaging in the above-alleged conduct, Stein Riso directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

134.    By engaging in the conduct described above, Stein Riso violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 thereunder (17 C.F.R. § 240. 10b-5).

## SEVENTH CAUSE OF ACTION

### (Breach of Contract)

135.    AE incorporates by reference each of the preceding allegations as if set forth herein.

136.    Stein Riso entered into an agreement with AE to provide legal services in exchange for a specified value.

137.    Specifically, AE agreed to issue Stein Riso 10 million shares of AE stock at par value in exchange for Stein Riso's services.

138.    AE did issue 10 million shares of AE stock to Stein Riso at par value.

139.    Stein Riso failed to perform its obligations under the contract by virtue of its inadequate and incompetent legal services, as alleged above.

140.    Stein Riso was compensated substantially more than was agreed upon, as alleged above.

141.    As a result of Stein Riso's breach of contract, AE has been damaged in the amount of its fees paid and purportedly owed to Stein Riso.

142.    Also as a result of Stein Riso's breach of contract, AE has further been damaged in that:

   a.    AE's stock is severely diluted;

   b.    AE has been deprived of the fair value of the stock that was improperly issued;

   c.    AE has been required to engage in costly litigation against Farley, incurring attorneys' fees and costs; and

   d.    AE has been required to engage in costly litigation against Farley, which has deprived AE of business and fundraising opportunities.

### EIGHTH CAUSE OF ACTION

**(Unjust Enrichment)**

143.    AE incorporates by reference each of the preceding allegations as if set forth herein.

144.    Stein Riso purported to provide legal services to AE in exchange for 10 million shares of AE stock.

145.    Stein Riso failed to provide the services as agreed upon, in that the services provided were inadequate and incompetent.

146.    Upon AE issuing 10 million shares to Stein Riso, the shares were actually worth approximately $.04 when considering the material non-public information Stein Riso was then aware of.

147.    Such enrichment occurred at AE's expense, as AE was deprived of fair value for its stock issued to Stein Riso.

148.    It is against equity and good conscience to permit Stein Riso to retain the 10 million AE shares it received in exchange for inadequate and incompetent legal work which enabled Farley to improperly dilute AE's shareholders.

149.    It is against equity and good conscience to permit Stein Riso to retain the 10 million AE shares it received while in possession of material non-public information that, when released to the public, resulted in the public trading value of the shares increasing by a factor of 40 from the nominal $.001 price at which Stein Riso received the shares.

## PRAYER FOR RELIEF

WHEREFORE, AE respectfully prays for relief against Stein Riso as follows:

1.      Compensatory damages according to proof but no less than $4,274,650.00, for injury resulting from AE's direct loss of the value of the shares of AE stock improperly issued at par value by Farley;

2.      compensatory damages according to proof but no less than $1,137,822.00, for injury to AE's subsequent capital raises as a result of the dilution of AE's share price;

3.      compensatory damages according to proof but no less than $900,000 for attorneys' fees incurred in AE's litigation against Farley to remedy Farley's self-dealing and improper stock issuances;

4.      compensatory damages according to proof for lost business and fundraising opportunities AE has been deprived of as a result of the improper stock issuances and ensuing litigation;

5.      for the violation of New York Rule of Professional Conduct 1.8, the return of the 10 million shares of AE stock issued to Stein Riso;

6.      for the violation of New York Rule of Professional Conduct 1.5, the return of the 10 million shares of AE stock issued to Stein Riso or their fair market value; and

7.      any other such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

AE respectfully demands a trial by jury for all issues so triable in this action.


DATED:  February 8, 2019    **BOND, SCHOENECK & KING, PLLC**

             Office and P.O. Address
             One Lincoln Center
             Syracuse, New York  13202-1355
             Telephone:  (315) 218-8000
             Email:  jfellows@bsk.com


             By: __*s/Jonathan B. Fellows*_____
               Jonathan B. Fellows, Esq. (Jf8629)
               Of Counsel

             **ENTERPRISE COUNSEL GROUP**
               A Law Corporation

             Office and P.O. Address
             3 Park Plaza, Suite 1400
             Irvine, CA  92614-8537
             Telephone:  (49) 833-8550
             David A. Robinson, Esq.
             Benjamin P. Pugh, Esq.
             Email:  drobinson@ecg.law
             Email:  bpugh@ecg.law

             *Attorneys for Plaintiff Applied Energetics, Inc.*


TO:  Stein Riso Mantel McDonough, LLP
    405 Lexington Avenue
    New York, NY  10174
    (212) 599-1515