UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| APPLIED ENERGETICS, INC., a<br>Delaware Corporation,<br><br>           Plaintiff,<br><br>    vs.<br><br>STEIN RISO MANTEL MCDONOUGH, LLP,<br>a New York Limited Liability Partnership,<br><br>        Defendant. | SECOND AMENDED<br>COMPLAINT<br><br>Civil Action No. 19-cv-01232<br>(AJN)<br><br>Jury Trial Demanded |

Plaintiff Applied Energetics, Inc., by and through its counsel of record, as and for its complaint against defendant Stein Riso Mantel McDonough, LLP, alleges as follows:

### SUMMARY

1.     This case concerns the misconduct and breach of fiduciary duty and the standard of care by Stein Riso Mantel McDonough, LLP ("Stein Riso") in its representation of Applied Energetics, Inc. ("AE") from 2016 to 2018.   During the time that Stein Riso was engaged as counsel for AE, Stein Riso advised, assisted, and encouraged George Farley ("Farley"), AE's former Principal Executive Officer ("PEO") and sole director, in his improper issuance of 63 million shares of AE stock at significantly below fair market price, including 25 million shares to Farley himself and 10 million shares issued directly to Stein Riso.

2.     Furthermore, both Stein Riso and Farley – with Stein Riso's counsel, assistance and encouragement – failed to seek or obtain proper valuations of AE's stock price and repeatedly ignored facts demonstrating that the true value was higher than the par value at which Farley ultimately issued the stock.  Stein Riso also repeatedly failed to advise Farley that each such share issuance was in direct violation of AE's bylaws.

3.     As demonstrated herein, each of these acts and omissions fell below the standard of care and constituted a breach of Stein Riso's fiduciary duty to AE.  Accordingly, in presently ongoing litigation between AE and Farley, the Delaware Court of Chancery recently granted a preliminary injunction preventing Farley's sale of his own shares based in

1

part on a finding that Farley likely breached his fiduciary duty to AE *by engaging in the same conduct materially assisted by Stein Riso in the instant action*.

4.      Moreover, by its acceptance of 10 million shares of AE stock for $10,000 worth of services, without obtaining an independent valuation, Stein Riso violated New York Rules of Professional Conduct 1.5 and 1.8, which allows AE to void the transaction.  AE previously elected to void the transaction but Stein Riso has not returned the 10 million shares.

5.      Via this lawsuit, AE seeks the return of the 10 million shares improperly issued to Stein Riso as well as monetary damages for the losses AE has suffered as a result of the improper issuance of its stock to Farley, Stein Riso, and other third parties, dilution of the value of subsequently issued stock, the legal fees and costs incurred in attempting to remedy the improper stock issuances, and the business and fundraising opportunities lost as a result of the improper stock issuance and the ensuing litigation.

## PARTIES

6.      Plaintiff AE is a corporation organized under the laws of the State of Delaware with its principal place of business in Tucson, Arizona.

7.      Stein Riso is a limited liability partnership formed under the laws of the State of New York with a registered address in New York, New York.

8.      Upon information and belief there are four members of Stein Riso:  Dennis L. Stein, Gerald A. Riso, Allan D. Mantel, and Kevin M. McDonough.

9.      Upon information and belief, Dennis L. Stein resides in and is a citizen of the State of New York.

10.     Upon information and belief, Gerald A. Riso resides in and is a citizen of the State of New York.

11.     Upon information and belief, Allan D. Mantel resides in and is a citizen of the State of New York.

12.     Upon information and belief, Kevin M. McDonough resides in and is a citizen of the State of New York.

13.     Upon information and belief, none of the members of Stein Riso resides in or is a citizen of the states of Delaware or Arizona.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between AE and Stein Riso and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c)(2) because Stein Riso is subject to this Court's personal jurisdiction.

## STATEMENT OF FACTS

### A. Farley Retains Stein Riso on Behalf of AE and Agrees to Pay in AE Stock

16.     Stein Riso entered into a retainer agreement with AE to provide legal services via letter dated February 4, 2016 and signed by Farley on February 9, 2016.  A copy of the retainer letter is attached hereto as Exhibit 1.

17.     The retainer letter provided that the scope of the retainer was for "general business and tax matters" and "such other matters which you may refer to us from time to time," but excluding "any matters involving your responsibilities under Federal or state securities laws."  The types of services AE asked Stein Riso to perform under the retainer agreement included review and comment on AE's Board meetings and actions, Board or committee authorizations, and other internal corporate procedures.  The retainer letter further required payment of bills within 30 days of receipt and made no mention of receiving shares in lieu of cash.

18.     Notwithstanding this fact, and after the retainer agreement was executed, Farley, on behalf of AE, negotiated with Dennis Stein ("Stein"), a partner of Stein Riso, an agreement to pay for $5,000 worth of Stein Riso's legal services via the payment of AE stock. Stein Riso attorney Ivan Dreyer ("Dreyer") prepared a draft Common Stock

Subscription Agreement and emailed it to Farley on February 9, 2016.  A copy is attached hereto as Exhibit 2.  Stein Riso represented AE in preparing the Common Stock Subscription Agreement and owed AE all the duties of attorneys representing clients in connection with that transaction.  On February 8, 2016, Dreyer billed AE 2.0 hours for "Preparing a draft of the proposed subscription agreement pursuant to which the firm would subscribe to purchase shares of common stock from client."

19.     The February 9, 2016 draft subscription agreement set the price at which Stein Riso would purchase 5,000,000 AE shares at $.001 per share, the same as par value.  No basis for this valuation was provided in the subscription agreement or in any prior written correspondence between Stein Riso and AE.

20.     At no time during or prior to this exchange, and at no time prior to the eventual execution of the Common Stock Subscription Agreement executed on or about February 16, 2016, did Stein Riso advise AE to consult independent legal counsel to review the Common Stock Subscription Agreement and did not seek or obtain written acknowledgement or waiver of this potential conflict from AE.

21.     The same day, February 9, 2016, Farley emailed Stein Riso a copy of AE's Board of Directors minutes purporting to authorize share issuances to "SRMM and others" and requested Stein Riso review and comment on these draft minutes.  A copy of this email exchange is attached hereto as Exhibit 3.  On February 9, 2016, Dreyer and Stein billed AE a total of 2.4 hours for:  "Submitting the draft subscription agreement to George Farley for his signature.  Review of his proposed board resolution authorizing the issuance of the shares and giving him my comments thereon."  And for:  "Review subscription agreement; previous documents regarding business of company; review minutes authorizing shares."

22.     The draft minutes Farley sent to Stein Riso were dated the following day, February 10, 2016.  This "meeting" had not yet occurred and Stein Riso was being asked to review and comment on the actions Farley *proposed* to take at this future meeting.  Moreover, the draft minutes contained two signature lines for AE directors, prompting

4

Dreyer to inquire whether there were other AE board members.  Dreyer then advised Farley that the minutes should address the price of the shares, the number of shares being issued, and the specific recipients.  A copy of Dreyer's email is attached hereto as Exhibit 4.

23.     Farley responded to Dreyer's February 9, 2016 email, informing him that he was the only AE director.  With respect to the stock price and list of recipients, Farley responded, "I can use par value as the price per share since it approximates FMV.  Will insert the names of the recipients and number of shares.  [¶] I am attaching a consent for the issuance of my shares."  Farley's email attached a draft "Unanimous Consent of the Compensation Committee of the Board of Directors to Action Taken Without A Meeting" dated February 10, 2016.  Accordingly, at the time Farley asked Stein Riso to review and comment on draft minutes of a hypothetical future AE board of directors meeting authorizing the issuance of shares to Farley and others at par value of $.001 per share, Stein Riso knew the draft minutes contemplated issuing 5 million AE shares to Farley, knew this was a self-interested transaction, and knew there were no disinterested AE directors.  Yet Stein Riso failed to advise AE that the proposed self-interested transaction needed to be either (1) approved by disinterested directors, and that AE could appoint or hold an election to seat disinterested directors, or (2) the proposed stock issuance could be submitted to AE's shareholders for approval, otherwise (3) the transaction was potentially voidable under Delaware's "entire fairness" review.  Had Stein Riso properly advised Farley of the applicable law and consequences of his then-proposed self-interested, but not yet consummated, transaction and that shareholders could challenge the transaction under Delaware's "entire fairness" review and the factors considered in such a review, AE is informed and believes, and thereon alleges, that Farley would not have been able to consummate the transaction.  Farley either would have taken Stein Riso's advice and (1) appointed or procured via shareholders election additional directors, (2) submitted the proposed transaction to AE's shareholders for approval, (3) sought independent valuation of AE stock (which would need to include the value of material non-public information of

which he was then aware, e.g., consulting agreement negotiations nearly finalized with Stephen McCahon ("McCahon") and Farley's plans to resume business operations and exit shell status, as discussed hereinbelow) and/or (4) sought independent advice concerning the "entire fairness" of the proposed transaction.  Or, if Farley ignored Stein Riso's advice and proceeded with the self-interested transaction without (1) appointing or seeking the election of any other directors, (2) submitting the proposed stock issuance to AE's shareholders for approval, or (3) doing anything to ensure the "entire fairness" of the transaction (e.g., obtaining an independent valuation *before* determining the price of the shares, obtaining the advice of an independent compensation consultant, delaying any stock issuance to himself based in any way on the public trading price until all material non-public information he was aware of had been made public, e.g. the consulting agreement with McCahon and plan to restart AE's business), Stein Riso (had it acted within the standard of care) would not have provided Farley with *any* assistance in consummating the transaction, but they did, as described herein.  Had Stein Riso properly advised AE, and Farley ignored their advice and proceeded to breach his fiduciary duties to AE, Stein Riso should have resigned, but did not. AE is informed and believes, and thereon alleges, Farley could not have obtained the assistance of any other attorneys acting within the standard of care and complying with their fiduciary duties to assist him in issuing tens of millions of AE shares at $.001 per share in breach of Farley's fiduciary duties to AE.

24.     Beyond this February 9, 2016 email exchange with Farley, upon information and belief, Stein Riso did not investigate whether its purchase of AE shares at par value was fair to AE and its shareholders.

25.     Upon information and belief, Stein Riso did not engage the services of an investment professional to value AE's shares, and knew that Farley had not obtained any such independent advice.

26.     At the time of the February 9 and 10, 2016 email exchanges between Farley and Stein Riso, AE's stock was traded publicly.  The closing prices as of February 9 and 10, 2016 were $.0036 and $.0044 respectively – approximately four times higher than par value of $.001.

27.     Farley sent an email to Stein and Dreyer on February 12, 2016 attaching a revised draft AE Board of Directors minutes dated February 15, 2016, which provided that AE was engaging Chris Rahne ("Rahne") to provide valuation services, and further, that that AE had or was going to enter into agreements with McCahon for technical services and Stephen McCommon ("McCommon") for accounting services in exchange for 20 million and 2 million AE shares, respectively, again all at $.001 per share.  The draft minutes also indicated Farley was contemplating issuing 20 million AE shares to himself "for past and continuing services as a Director and Chief Executive Officer of the Corporation."  A copy of Farley's February 12, 2016 email and attached draft minutes is attached hereto as Exhibit 5.

28.     The February 12, 2016 draft AE Board of Directors minutes doubled the shares granted to Stein Riso, from the 5 million originally agreed upon to 10 million, without explanation and without any negotiation or request for such increase from Stein Riso.

29.     Without waiting for Rahne's valuation of AE's stock, and without independently investigating the value of the stock, Stein Riso executed its subscription agreement for 10 million AE shares at $.001 per share on February 16, 2016.  A copy of the subscription agreement is attached hereto as Exhibit 6.

30.     The executed subscription agreement did not contain anything indicating that par value was a fair price for the shares, that AE was advised to consult with an independent attorney, or that AE gave its written informed consent of the possibility of a conflict with respect to the transaction.  At no time did Stein Riso advise AE in writing of its right to seek the advice of independent legal counsel, and did not give AE a reasonable opportunity to seek such independent advice.  At no time did AE provide Stein Riso with informed written consent as to the essential terms of the transaction and the lawyer's role in the transaction.

The language in Section 5(l) of the February 16, 2016 Common Stock Subscription Agreement, alleging that AE had either consulted with independent counsel or been so advised, is false.  Both Farley and Stein Riso knew this language was false when they executed the Common Stock Subscription Agreement on February 16, 2016.  Stein Riso knew AE had not been so advised because they were AE's lawyers and had not done so, knew AE had no other lawyers, and knew AE's prior lawyers, Blank Rome, had quit.  Stein Riso further knew AE had not actually consulted with any other attorney.  Moreover, the language is inadequate to satisfy Stein Riso's obligations under New York Rule of Professional Conduct 1.8 because it does not describe the conflict between AE and Stein Riso and therefore did not inform AE of the conflict, does not advise the client *to seek* (as opposed to misrepresenting that the client has already done so) the advice of an independent attorney and did not give AE a reasonable opportunity *after being so advised* to seek and obtain such independent advice, and does not amount to informed written consent of the attorneys' self-interested role in the transaction.

**B. Stein Riso Fails to Properly Advise Farley and AE of Their Legal Obligations**

31.     On or about January 29, 2016, but effective February 10, 2016, AE's only director other than Farley, John Levy, resigned from his position, leaving Farley as the only director.  Farley informed Stein Riso as much when Dreyer inquired in response to Farley's February 9, 2016 email inquiring about the draft February 10, 2016 Board of Directors minutes.

32.     Farley informed Stein Riso, through the February 12, 2016 draft AE Board of Directors minutes, that he intended to issue 20 million shares of AE stock to himself, 20 million shares to McCahon, 2 million shares to McCommon, and 1 million shares to Rahne, in addition to the 10 million shares to Stein Riso, all for $.001 per share.  Stein Riso reviewed these draft minutes and provided Farley with a redlined version on February 12, 2016, indicating Stein Riso's suggested changes and revisions.  Stein Riso billed 1.5 hours of Dreyer's time to AE for this work:  "Telephone call with client relating to the mechanics of increasing the authorized common stock of the corporation.  Review of a draft board

resolution relating to such increase as well as certain stock issuances. Preparing a revised draft of such board consent and submitting it to client for its review."

33.     At the time it received and reviewed these draft minutes, Stein Riso knew Farley was breaching his fiduciary duties to AE in causing AE to issue these tens of millions of AE shares to himself, Stein Riso and these other individuals. Stein Riso knew that AE had purported to engage Rahne for "valuation services" of AE's stock, but knew that Rahne had not provided any such valuation prior to Farley unilaterally claiming he could use par value as the price by which he would sell tens of millions of AE shares to Farley, Stein Riso, and third parties, including Rahne. Stein Riso also knew that par value was the lowest price AE could legally sell AE shares. Stein Riso knew Farley's transaction was self-interested without complying with any of the most basic conflict avoidance procedures required under Delaware law. Stein Riso further knew that its purchase of 10 million AE shares for $.001 was made without complying with New York Rule of Professional Conduct 1.8, that it had not obtained any valuation of AE's stock, and that it was in possession of material non-public information. Stein Riso knew Farley had a fiduciary duty to AE, as AE's sole director and PEO, to negotiate for the highest possible stock price from any third parties seeking to purchase AE shares. Stein Riso further knew that Farley had unilaterally set the value he would cause AE to issue shares at the par value, $.001 per share, the lowest price AE could legally sell treasury shares, and had not reached that value through any negotiations with any third party. Stein Riso further knew Farley intended to use the same par value, $.001 per share, as the valuation of the shares he was contemplating improperly issuing to himself via a conflicted, self-interested transaction. Stein Riso therefore knew that Farley was breaching his fiduciary duties to AE in issuing tens of millions of AE shares to himself, Stein Riso, and other third parties set forth in the draft February 12, 2016 board minutes at the par value of $.001 per share.

34.     Had Stein Riso complied with its legal and ethical duties in engaging into a business transaction with a client (the February 16, 2016 Common Stock Subscription

9

Agreement), and done a proper investigation of the true fair market value of AE's stock, Stein Riso would have known that $.001 per share was not the fair market value of AE's stock at the time, that AE once had a market value of over $1 billion, that AE's intellectual property portfolio was obtained via investment of over $100 million, and that AE's nearly final negotiations with McCahon and plans to restart its business was material non-public information rendering the public trading value of AE's stock an incomplete and artificially low value. With that information, Stein Riso would and should have known that Farley's "sale" of tens of millions of shares of AE stock at $.001 per share to Farley, Stein Riso and other third parties was a gross breach of Farley's fiduciary duties to AE and its existing shareholders.

35. Nonetheless, despite its actual knowledge Farley was breaching his fiduciary duties to AE by issuing tens of millions of AE shares for $.001 per share to Farley, Stein Riso and other third parties, Stein Riso materially assisted Farley in carrying out Farley's intended stock issuances by consenting to Farley utilizing Stein Riso's form subscription agreement for the additional issuances, by reviewing and revising the draft Board of Directors minutes authorizing the issuances, and by preparing and filing a amendments to AE's charter with the Delaware Secretary of State increasing the authorized amount of AE shares from 125 million to 500 million, and providing an opinion letter to AE's stock transfer agent purporting to opine the stock issuances were valid.

36. Farley ultimately used the form subscription agreement prepared by Stein Riso to issue tens of millions of shares to several third parties, all at $.001 per share, which shares would total more than one-half of AE's pre-dilution equity.

37. On February 16, 2016, the same day that Stein Riso executed the subscription agreement, Farley sent an email to Stein Riso which included his written consent, as AE's lone director, to make the issuances contemplated by the draft Board of Directors minutes: 20 million shares to Farley personally, 10 million shares to Stein Riso, 20 million shares to

McCahon, 2 million shares to McCommon, and 1 million shares to Rahne.  A copy of Farley's February 16, 2016 email is attached hereto as Exhibit 7.

38.     Also included in Farley's February 16, 2016 email was an executed "unanimous" agreement from AE, signed only by Farley, granting Farley – personally – 5 million shares under AE's 2004 Stock Incentive Plan.

39.     By virtue of its knowledge that Farley was the lone director of AE, Stein Riso also knew that AE's issuances of stock to Farley constituted self-interested transactions and were therefore subject to Delaware's conflict of interest statute.

40.     Stein Riso did not advise Farley or AE of the conflict of interest problem the AE-Farley transactions presented.

41.     Stein Riso did not advise AE to seek and obtain an independent valuation before determining the stock issuance price, to seek the approval of the disinterested shareholders for the stock issuance, to seek to appoint or hold a shareholder vote to elect independent directors to the two then-vacant board seats to review the proposed stock issuance to Farley, or expend any additional effort to determine whether 1/4 of the AE's pre-dilution equity was being issued to Farley at a fair price.

42.     Stein Riso also failed to advise AE that if the approval of disinterested directors and shareholders was not obtained, the transaction would need to be completely fair to AE, which would require, at a minimum, a disinterested valuation of the shares being issued to Farley.  Instead, Stein Riso opted to stay silent on these basics of corporate governance and actively assisted Farley in raiding AE's equity, itself a major beneficiary.

43.     Stein Riso failed to inform AE that an evaluation performed by Rahne, who had a financial interest in the valuation of AE's stock by virtue of his own issuance, would not be "disinterested."  Stein Riso further failed to inform AE that any valuation performed by Rahne, after the price for his "purchase" of AE shares had already been set at $.001 per share, would necessarily be tainted and unreliable.

44.     Pursuant to AE's bylaws and resolutions of its Board of Directors, as of February and March 2016, AE Board of Directors actions could be taken only by a majority vote of a three-member board.

45.     Stein Riso did not inform AE that AE's bylaws did not allow Farley to unilaterally approve stock issuances as a lone director, nor did it inform AE at any point that the issuances Farley had contemplated and approved were potentially invalid.

**C. Stein Riso Continues to Aid and Abet Farley's Malfeasance**

46.     On February 19, 2016, Farley requested that Stein Riso prepare a legal opinion letter regarding the 5 million shares he had decided to issue to himself, as the lone member of AE's Compensation Committee.  Dreyer declined to do so initially, noting that Stein Riso could not provide legal services regarding securities under the retainer agreement.  A copy of the email exchange between Farley and Dreyer is attached hereto as Exhibit 8.

47.     On February 23, 2016, Dreyer emailed Farley draft amendments to AE's charter which increased the number of authorized shares to 500 million from 125 million.  This increase was necessary to effectuate the various share issuances Farley was planning, including those to himself and to Stein Riso, because AE's charter did not allow for the issuance of another 63 million shares of stock.  A copy of the draft amendments is attached hereto as Exhibit 9.

48.     On March 1, 2016, Farley emailed Stein and Dreyer regarding AE issuing 10 million shares to Stein Riso.  A copy of Farley's email is attached hereto as Exhibit 10.  Farley stated that AE would require Stein Riso to issue a legal opinion that the shares are authorized and that the legend on the shares is correct.  Dreyer noted that it would be inappropriate for Stein Riso to issue an opinion relating to shares it was to receive.  A copy of Dreyer's email is attached hereto as Exhibit 11.

49.     Notwithstanding his assertion, Stein Riso issued the requested opinion both for the 10 million shares issued to Stein Riso and the 20 million shares issued to Farley, as well as the 20 million shares issued to McCahon and 5 million shares issued to Duft Bornsen & Fettig LLP.  A copy of the opinion is attached hereto as Exhibit 12.

50.     Stein Riso's March 22, 2016 opinion letter indicates, among other things, that Stein Riso "examined each Subscription Agreement, the corporate proceedings of the Company related to the authorization of the Subscription Agreements and the terms of issuance relating to the issuance of the subject securities thereunder and such other matters including matters of law as we have deemed necessary for purposes of rendering this opinion."  AE is informed and believes, and thereon alleges, that Stein Riso's examination as described fell below the standard of care required under New York and any other applicable law.  Stein Riso failed to discover that AE's bylaws required the number of director seats to be set via board resolution, but failed to perform an adequate investigation to discover the number of director seats then required under the operative board resolution.  AE is informed and believes, and thereon alleges, that AE's board voted to reduce the authorized number of directors from five to three at its July 9, 2012 meeting, reported in its SEC filings thereafter a three-member board, and never altered this three-member board requirement thereafter.  Had Stein Riso performed a competent investigation within the standard of care, it would have discovered the number of required directors (three) and would have known that Farley, as a sole director, did not constitute a quorum of AE's board of directors and therefore could not unilaterally act as AE's board of directors.  Had Stein Riso performed an adequate investigation within the standard of care, it would have learned that the 55 million shares Farley unilaterally authorized to be issued to Farley, Stein Riso, McCahon and Duft Bornsen & Fettig LLP were not in fact validly issued and AE shares could not be issued to these individuals and entities, as their opinion letter incorrectly stated.

51.     Prior to issuing this opinion, Stein Riso received and analyzed March 11, 2016 minutes from AE, which authorized AE to negotiate with Rahne for valuation services; however, no valuation had been received from Rahne.  A copy of the March 11, 2016 Board of Directors meeting minutes is attached hereto as <u>Exhibit 13</u>.  The minutes also indicated Farley's intent to issue another 5 million AE shares to Duft, Bornsen & Fettig, LLP at $.001 per share.

13

52.     On March 15, 2016, Dreyer emailed Farley concerning subscription agreements for Rahne, McCahon, Duft Bornsen & Fettig, LLP, and Farley.  A copy of Farley's email is attached hereto as <u>Exhibit 14</u>.  Stein Riso reviewed the subscription agreements for AE.

53.     In reviewing the subscriptions, Dreyer specifically informed Farley that "if services (as opposed to cash) are intended to constitute the subscriber's payment for the stock, such services must have been rendered prior to the issuance of the stock and must have reached a value equal to the stated purchase price."

54.     In response, Farley stated that AE is accruing fees for McCahon that exceed the purchase price of the stock and that AE is accruing fees of $12,500 per month for Farley's services, both of which exceed the total value of the subscription.  A copy of Farley's email is attached hereto as <u>Exhibit 15</u>.

55.     On April 26, 2016, Farley arranged, with Stein Riso's assistance, to transfer 20 million of his newly-issued shares to AnneMarieCo. LLC, an entity owned and controlled by Farley's immediate family members, including Farley's wife.  Since Stein Riso knew the 20 million shares Farley caused AE to issue to himself were issued in violation of Farley's fiduciary duties to AE, Stein Riso further knew that Farley's transfer of these 20 million shares to a "family limited liability company" constituted a fraudulent transfer, yet assisted Farley complete the transfer.

**D. Stein Riso Benefits from Inside Information**

56.     On March 21, 2016, AE filed a Form 8-K with the SEC indicating it had filed a certificate of amendment to its Certificate of Incorporation increasing its authorized common stock from 125,000,000 to 500,000,000, which amendment Stein Riso had prepared and sent to Farley on February 23, 2016.  As of March 22, 2016, AE's stock closed at $.0055.

57.     At the time that Stein Riso subscribed for 10 million shares, AE was in the process of restarting its business operations, including negotiating a consulting agreement

with McCahon to restart research operations and the preparation of a new partnership investment, both of which facts were known to Stein Riso but were not publicly disclosed.

58.     On March 30, 2016, AE filed its Form 10-K with the SEC wherein it disclosed, among other things, "The company is planning to reactivate its previous business activities pursuant to Teaming and Consulting Agreements with Applied Optical Sciences, Inc. ("AOS") and Dr. Stephen W. McCahon, Ph.D., one of the company's founders and owner of AOS who was primarily responsible for development of the Company's existing Intellectual Property portfolio (collectively the "Consultants")."

59.     On March 31, 2016, with a volume of 1,449,139 shares traded, AE's stock closed at $.012.  Two trading days later, on April 4, 2016, AE's stock closed at $.04, or *forty times* the price Stein Riso had "paid" for its 10 million AE shares.  AE is informed and believes, and thereon alleges, that this dramatic increase in AE's stock price was the factoring in by the market of the material non-public information Farley and Stein Riso were aware of when they negotiated their purchase of AE stock at par value.

60.     Upon information and belief, Stein Riso was aware no later than February 12, 2016 that McCahon would contract with AE to restart AE's research and development activities, which would foreseeably dramatically increase AE's market price.

61.     Though it is dated February 9, 2016, Stein Riso did not finalize its subscription agreement with AE until February 16, 2016, after it learned of this material non-public information.  Stein Riso's actions ensured that it was able to purchase AE's shares at a knowingly artificially-low value before the market reacted to the announcement of AE's resumption of business activities and consulting agreement with McCahon.

**E. Stein Riso Belatedly Receives a Fraudulent Valuation of AE's Shares**

62.     On April 28, 2016, Stein Riso received an email sent by Farley to Rahne.  In the email, Farley requested a retroactive valuation, noting that the company "has recently issued 63 million shares" and stated that he thought he could use "fair value rather than quoted trading prices."  A copy of the email is attached hereto as Exhibit 16.

63.     On September 13, 2016, Stein Riso learned, via receiving an email from Farley, that Superius Securities Group, Inc., a shareholder in AE, was challenging the stock issuances authorized by Farley.  In an internal Stein Riso email from Dreyer to Stein dated November 17, 2016, Dreyer wrote that in order to investigate whether the issuance of AE shares at $.001 per share were proper, he had "discussions with both George Farley and Dennis concerning the board's basis for establishing the subscription price and was told that it was based both on the price at which the stock had traded and on the opinion of an appraiser."  A copy of the email is attached hereto as Exhibit 17.

64.     Upon information and belief, at the time Stein Riso executed its subscription agreement with AE and received its 10 million shares, Stein Riso had neither obtained the opinion of an appraiser nor ever checked the public trading price for AE's shares.

65.     On November 17, 2016, Stein Riso received the first drafts of Rahne's valuation.  A copy of the November 17, 2016 email including Rahne's first draft valuation is attached hereto as Exhibit 18.

66.     Prior to receiving the final version of the Rahne valuation, upon information and belief, Stein Riso was aware that Farley had personally interfered with the valuation by suggesting multiple times that Rahne make changes to it.

67.     Stein Riso received the final valuation from Rahne on January 23, 2017, almost a full year after AE and Stein Riso used par value as fair market value to issue approximately two-thirds of AE's pre-dilution equity.  A copy of the final Rahne valuation is attached hereto as Exhibit 19.

**F. Stein Riso Bills – And Overbills – AE**

68.     On March 3, 2016, Stein Riso issued its first bill to AE.  The bill total was $11,585.13 but deducted a $10,000 credit for "Agreed credit to client in exchange for the issuance to the firm of clients shares of common stock."

69.     Stein Riso's bills show that it acted affirmatively in aiding and abetting Farley's misconduct, including entries such as:

a. Preparing the subscription agreements giving roughly two-thirds of AE's equity to various individuals at the lowest legally-possible value of $.001;

b. Preparing and filing the amendment to AE's articles that made Farley's self-dealing possible;

c. Reviewing and commenting on each director resolution authorizing Farley to issue the shares;

d. Issuing legal opinions to AE's transfer agent in connection with each stock issuance; and

e. Reviewing and advising Farley in connection with finalizing each subscription agreement, including the formalities associated with the stock issuances thereunder.

70.     Stein Riso also billed hours on securities matters, including a three-hour phone call "with a securities specialist," despite the fact that the retainer agreement specifically prohibited Stein Riso from providing legal services relating to securities.

71.     Stein Riso's bills also contain several errors and improper charges, such as:

a. Billing AE for work done on "Alissa Pharmaceutical," which has nothing to do with AE;

b. Billing AE for preparing and reviewing its own legal opinion for the stock that was transferred to Stein Riso;

c. Billing AE for errors it made in preparing the Delaware charter amendment;

d. Billing AE to review Stein Riso's own Schedule 13-D filing; and

e. Billing AE to assist Farley personally in transferring his shares to AnneMarieCo, a family limited liability company, of no benefit to AE.

## **FIRST CAUSE OF ACTION**

### **(Legal Malpractice)**

72.     AE incorporates by reference each of the preceding allegations as if set forth herein.

73.     Stein Riso was retained as attorneys for AE on February 4, 2016.

74.     As AE's attorneys, Stein Riso owed AE a duty to exercise that degree of care, skill, and diligence commonly possessed and exercised by members of the legal community.

75.     As AE's attorneys, Stein Riso owed AE fiduciary duties of the utmost good faith.

76.     Stein Riso were not attorneys for, and did not owe fiduciary duties to, Farley personally.

77.     Pursuant to its fiduciary duty to AE, Stein Riso was obligated to exercise the highest degree of good faith, honesty, integrity, fairness, and fidelity.

78.     Pursuant to its fiduciary duty to AE, Stein Riso was required to protect AE from liability in every possible way.

79.     Pursuant to its fiduciary duty to AE, Stein Riso was required to advise AE of the legality of its actions.

80.     Pursuant to its fiduciary duty to AE, Stein Riso was required to help AE avoid wrongdoing.

81.     Pursuant to its fiduciary duty to AE, Stein Riso was required to discuss with AE any of AE's conduct that was violative of laws or regulations, to urge cessation of such conduct, and to withdraw from representation rather than aid in the continuation of such conduct.

82.     Pursuant to its fiduciary duty to AE, Stein Riso was required to place AE's interest above its own.

83.     Pursuant to its fiduciary duty to AE, Stein Riso was prohibited from engaging in an interested transaction which is not entirely fair to AE.

84.     Pursuant to its fiduciary duty to AE, Stein Riso was prohibited from profiting from the use of confidential corporate information.

85.     Stein Riso failed to exercise that degree of care, skill, and diligence commonly possessed and exercised by members of the legal community, and further breached its

fiduciary duties to AE, in its representation of AE concerning its stock issuances of 63 million shares at $.001 per share, described above.

86.     No reasonable attorney acting within the standard of care would determine that it was appropriate to:

a.   fail to investigate whether par value of $.001 per share was the fair market value for AE common stock when Farley issued – with Stein Riso's assistance – 63 million shares of AE treasury stock, more than two-thirds of AE's pre-dilution equity, 25 million of those shares to Farley and 10 million to Stein Riso;

b.   assist Farley in issuing 63 million shares of AE Common Stock to third parties at par value, which was a fraction of the shares' true value;

c.   fail to advise Farley that issuing 25 million shares to himself as AE's sole officer or director was self-dealing and needed to be approved by disinterested directors, disinterested shareholders, or else be entirely fair to AE;

d.   fail to investigate whether Farley's issuance of 25 million AE shares to himself was entirely fair to AE;

e.   fail to inform and advise AE of the nature and effect of the McCahon, Rahne, McCommon, and Fettig stock subscription agreements;

f.   fail to inform AE that it would be inappropriate to issue approximately 63 million shares of AE common stock – approximately two-thirds of the pre-diluted equity – at $.001 per share without first receiving an independent valuation, yet materially assist Farley issue those shares knowing no such independent valuation had been obtained;

g.   fail to advise AE that it would be inappropriate for AE to pay for the Rahne valuation in the very shares Rahne was valuing;

h.   fail to advise AE that it would be inappropriate to set the price of the shares in the agreement hiring Rahne to value the shares;

19

i.  fail to inform and advise AE of the nature and effect of AE's bylaws on Farley's ability to unilaterally take actions on behalf of AE's board of directors;

j.  fail to inform and advise AE that Farley was unable to issue stock without additional directors being added to the Board;

k.  knowingly provide and bill AE for legal services relating to securities matters when securities issues were specifically excluded from the retainer agreement.

l.  charge AE for Stein Riso's provision of legal advice to Farley personally.

m.  bill AE to review Stein Riso's own 13-D filing;

n.  agree to "buy" AE shares in possession of material non-public information, including AE's plan to restart its business and consulting agreement with McCahon;

o.  repeatedly ignore facts demonstrating AE common shares were worth substantially more than the par value price at which Farley and Stein Riso were providing for more than two-thirds of AE's pre-dilution value;

p.  fail to ever check the public market price for AE shares which would have indicated that at all relevant times, AE was trading at multiple times the price at which AE and Stein Riso were giving the shares away and had never traded at $.001 or lower;

q.  alternatively, if Stein Riso ever did check the public trading price of AE's shares, they failed to ever mention, discuss or advise AE that issuing 63 million shares at $1/4$ the public trading price would violate Farley's fiduciary duties to AE.

r.  Accepting securities as payment from AE in a transaction which was not fair and reasonable in violation of New York Rule of Professional Conduct 1.8.

s.  Charging AE excessive fees for its work in violation of New York Rule of Professional Conduct 1.5, in that Stein Riso accepted 10 million shares of AE

stock at par value as payment while knowing material non-public information which foreseeably caused AE's share price to rise.

87.     Stein Riso committed each of the above-alleged breaches despite having actual knowledge of the following facts:

    a.  Farley was the only director of AE at the time he issued AE stock to himself.

    b.  Farley's issuances of AE stock to himself constituted self-interested transactions.

    c.  AE's issuances of shares to Farley were subject to Delaware's conflict of interest statute, which prohibited the transaction.

    d.  AE's issuances of shares to Farley, Stein Riso, McCahon, McCommon and Rahne constituted 1/4 of AE's pre-dilution equity.

    e.  Stein Riso at all times had access to the public trading price of AE stock.

    f.  Rahne had been hired to provide a valuation, but at the time of the stock issuances in question, had not provided one.

    g.  Rahne was to be compensated in AE shares – the same shares he was retained to appraise.

    h.  AE was in the process of contracting with McCahon to restart AE's research and development activities, which would foreseeably increase the market price of AE stock.

88.     None of the above-alleged failures to exercise the degree of care, skill, and diligence commonly possessed and exercised by members of the legal community and breaches of Stein Riso's fiduciary duties was approved by a majority of AE's disinterested directors because none existed at the time.

89.     None of the above-alleged failures to exercise the degree of care, skill, and diligence commonly possessed and exercised by members of the legal community and breaches of Stein Riso's fiduciary duties was approved by a majority of AE's disinterested shareholders.

90.     As a direct and proximate result of each of the above-alleged failures to exercise the degree of care, skill, and diligence commonly possessed and exercised by members of the legal community and breaches of Stein Riso's fiduciary duty, AE's stock is severely diluted.

91.     As a direct and proximate result of each of the above-alleged failures to exercise the degree of care, skill, and diligence commonly possessed and exercised by members of the legal community and breaches of Stein Riso's fiduciary duties, AE has been deprived of the fair value of the stock that was improperly issued.

92.     As a direct and proximate result of each of the above-alleged failures to exercise the degree of care, skill, and diligence commonly possessed and exercised by members of the legal community and breaches of Stein Riso's fiduciary duties, AE has been required to engage in costly litigation against Farley, incurring attorneys' fees and costs.

93.     As a direct and proximate result of each of the above-alleged failures to exercise the degree of care, skill, and diligence commonly possessed and exercised by members of the legal community and breaches of Stein Riso's fiduciary duties, AE has been required to raise capital via selling shares at below their true value because of the dilution that Stein Riso's breaches of its fiduciary duties caused.

94.     As a direct and proximate result of each of the above-alleged failures to exercise the degree of care, skill, and diligence commonly possessed and exercised by members of the legal community and breaches of Stein Riso's fiduciary duties, AE has been required to engage in costly litigation against Farley, which has deprived AE of business and fundraising opportunities, and distracted its management and executives' time and efforts away from such business and fundraising efforts.

## SECOND CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)

95.     AE incorporates by reference each of the preceding allegations as if set forth herein.

96.     At all relevant times, Farley owed fiduciary duties of care and loyalty to AE. At all relevant times, Stein Riso knew Farley owed these fiduciary duties to AE.

97.     Farley breached his fiduciary duties to AE by, among other things, engaging in self-dealing and self-interested transactions that were not entirely fair to AE and with the knowledge of material non-public information, failing to comply with AE's bylaws, issuing stock to third parties, including Stein Riso, at par value despite fair market value and the publicly trading value being significantly higher, and failing to obtain independent valuation of AE's shares before issuing the foregoing stock.

98.     As AE's then-attorneys, and based on the information of which Stein Riso was aware, Stein Riso knew Farley was breaching his fiduciary duties to AE in the issuance of 63 million shares to himself, Stein Riso, and others, at par value.  Stein Riso knew Farley was breaching his fiduciary duties in fraudulently transferring 20 million shares he had issued to himself to a family owned LLC, AnneMarieCo, LLC.

99.     Stein Riso knowingly participated in Farley's breaches of his fiduciary duties by, among other things:

      a.  knowingly providing the forms and legal work Farley used to issue stock at par value to himself and others.

      b.  knowingly preparing, reviewing and commenting on the documents Farley needed to consummate the transactions that constituted his breach of fiduciary duty.

      c.  assisting Farley with AE's issuances of stock despite knowing that no valuation had been performed on the shares and that $.001 was the par value and lowest legally-possible price for the shares to be issued.

      d.  providing an opinion letter supporting AE's improper issuances of stock to Farley, Stein Riso, McCahon, and Duft Bornsen & Fettig LLP.

     e.   assisting Farley with Farley's transfer of stock to AnneMarieCo, LLC, in an effort to avoid Farley's personal liability for having improperly obtained the stock.

     f.   performing these acts, and all of them, with the knowledge that the stock issuances and transfers carried out by Farley were completed in breach of Farley's fiduciary duties to AE.

100.    By each of the above-alleged acts, Stein Riso gave Farley substantial assistance in carrying out Farley's breach of his fiduciary duties to AE.

101.    As a direct and proximate result of Stein Riso giving Farley substantial assistance in Farley's breaches of fiduciary duty, AE's stock is severely diluted.

102.    As a direct and proximate result of Stein Riso giving Farley substantial assistance in Farley's breaches of fiduciary duty, AE has been deprived of the fair value of the stock that was improperly issued.

103.    As a direct and proximate result of Stein Riso giving Farley substantial assistance in Farley's breaches of fiduciary duty, AE has been required to engage in costly litigation against Farley, incurring attorneys' fees and costs.

104.    As a direct and proximate result of Stein Riso giving Farley substantial assistance in Farley's breaches of fiduciary duty, AE has been required to engage in costly litigation against Farley, which has deprived AE of business and fundraising opportunities.

## THIRD CAUSE OF ACTION

### (Rescission and Restitution/Recoupment for Violations of New York Rules of Professional Conduct 1.5 and 1.8)

105.    AE incorporates by reference each of the preceding allegations as if set forth herein.

106.    Stein Riso served as AE's attorneys pursuant to a retainer agreement.

107.    As New York attorneys, Stein Riso was bound to follow New York Rules of Professional Conduct 1.5 and 1.8.

109.    Stein Riso had a duty not to charge AE excessive fees for its work.

110.    Stein Riso received 10 million shares of AE stock in exchange for the work it performed for AE.

111.    Such shares were issued at par value, $.001 per share, therefore, Stein Riso agreed to perform the work for $10,000 of value.

112.    At the time Stein Riso agreed to accept AE shares as payment, Stein Riso was aware of material non-public information which foreseeably caused AE's share price to rise when publicly revealed.

113.    Two months after Stein Riso accepted AE shares as payment at $.001 per share, and after the material non-public information it was aware of had been publicly revealed, Stein Riso assisted Farley in transferring 20 million of his own shares to AnneMarieCo, LLC at a value of $.04 per share.  AE is informed and believes, and thereon alleges, that the true fair market value of AE stock at the time Stein Riso executed its subscription agreement on February 16, 2016, was $.04 per share, not $.001 per share.

114.    Stein Riso therefore received $400,000 worth of AE shares in exchange for an agreed-upon $10,000 worth of services.

115.    Stein Riso claims to be owed an additional $54,120.67 by AE, a portion of which is for work done for other clients or which was not permitted by the retainer agreement between Stein Riso and AE.

116.    $454,120.67 is an excessive fee for approximately $50,000 worth of work.

117.    As a result of Stein Riso's violation of New York Rule of Professional Conduct 1.5, Stein Riso must return the excessive fees to AE.

119.    Under New York Rule of Professional Conduct 1.8, Stein Riso had a duty not to enter into a business transaction with a client, including accepting securities as payment, unless the transaction was fair and reasonable; the client is advised in writing of seeking and is given a reasonable opportunity to seek, the advice of independent legal counsel; and the

client gives informed written consent as to the essential terms of the transaction and the lawyer's role in the transaction.

120.    Stein Riso had a duty to determine the true fair market value of any securities it was granted in lieu of fees before accepting such securities.

121.    Stein Riso agreed to accept shares of AE as payment for its work on behalf of AE.

122.    Stein Riso did not obtain a valuation of AEs shares prior to accepting them.

123.    Stein Riso did not ascertain the market price of AE stock prior to accepting them.

124.    Stein Riso only received the Rahne valuation nearly an entire year after accepting AE's shares as payment at par value.  Even then, Stein Riso knew that the Rahne valuation was not independent or impartial.

125.    Stein Riso did not ensure the issuance of AE shares to Stein Riso at par value was fair and reasonable to AE and AE's shareholders.

126.    Stein Riso did not advise AE in writing to seek independent legal counsel.

127.    Stein Riso did not obtain informed written consent to the essential terms of AE's issuance of AE shares to Stein Riso at par value, such as the advisability of obtaining independent valuation services.

128.    Stein Riso prepared the subscription agreement which issued AE stock to itself at par value.

129.    Stein Riso's conduct was in violation of New York Rule of Professional Conduct 1.8.

130.    Violations of New York Rule of Professional Conduct 1.8 permit the client to void the transaction.

131.    As a result of Stein Riso's violation of New York Rule of Professional Conduct 1.8, AE elects to void the stock issuance to Stein Riso.  AE is therefore entitled to rescind the transaction and the return of the 10 million AE shares improperly issued to Stein Riso.

## FOURTH CAUSE OF ACTION

### (Securities Fraud)

132.    AE incorporates by reference each of the preceding allegations as if set forth herein.

133.    At the time that Stein Riso agreed to receive AE shares at par value as payment for its services, Stein Riso was in possession of material non-public information about AE's plans to restart its business operations, exit shell status, and enter into agreements with McCahon and AOS, which information Stein Riso received because of its insider position as AE's attorneys.

134.    This information was treated as confidential by AE and was not made public until months later.  Although this information was known to AE's sole remaining officer and director, the information was not known to the public, and therefore the market, so it was not taken into account in the public trading price.  AE and Stein Riso based their $.001 valuation on what Farley (however improperly) determined "approximated fair market value" based in part on the then-public trading price of $.004.  Because both AE and Stein Riso knew the public trading price did not account for this material non-public information, they both knew basing the price Stein Riso purchased AE stock from AE using the public trading price as a comparison point was fraudulent because the market had not taken into account the material non-public information.  They therefore defrauded all AE's shareholders and the entire market trading in AE stock by improperly diluting AE based on a price they knew was not an accurate reflection of the true fair market value of AE's stock.

135.    Stein Riso knew or was reckless in not knowing that the information it possessed and traded on was material and non-public, and that it owed AE and its shareholders a fiduciary duty of care and loyalty to keep this information confidential and to refrain from trading on it.

136.    Stein Riso breached a fiduciary duty, or a similar duty of trust and confidence to AE, by trading on the basis of material non-public information it obtained through its representation or prospective representation of AE.

27

137.     By engaging in the above-alleged conduct, Stein Riso directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

138.     By engaging in the conduct described above, Stein Riso violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 thereunder (17 C.F.R. § 240. 10b-5).

## **PRAYER FOR RELIEF**

WHEREFORE, AE respectfully prays for relief against Stein Riso as follows:

1.     Compensatory damages according to proof but no less than $26,000,000, for injury resulting from AE's direct loss of the value of the shares of AE stock improperly issued at par value by Farley;

2.     Additional compensatory damages according to proof but no less than $6,000,000, for injury to AE in connection with excess shares AE was required to issue at an artificially low value, due to Farley and Stein Riso's wrongdoing and dilution of AE's stock, in connection with AE's subsequent capital raises;

3.     Compensatory damages according to proof but no less than $1,000,000 for attorneys' fees and other costs incurred in AE's litigation against Farley and AnneMarieCo. LLC to remedy Farley's self-dealing, improper stock issuances, and other wrongful conduct;

4.     Compensatory damages according to proof for lost business and fundraising opportunities AE has been deprived of as a result of the improper stock issuances and ensuing litigation;

5.    For the violation of New York Rules of Professional Conduct 1.5 and 1.8, the rescission of the Common Stock Purchase Agreement between AE and Stein Riso and the return of the 10 million shares of AE stock issued to Stein Riso thereunder;

6.    For the violation of New York Rule of Professional Conduct 1.5 and 1.8, the return of the 10 million shares of AE stock issued to Stein Riso or restitution in the amount of their fair market value; and

7.    Any other such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

AE respectfully demands a trial by jury for all issues so triable in this action.

DATED: May 13, 2019            **BOND, SCHOENECK & KING, PLLC**

Office and P.O. Address
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: (315) 218-8000
Email: jfellows@bsk.com

By:_*s/Jonathan B. Fellows*_____
        Jonathan B. Fellows, Esq. (Jf8629)
        Of Counsel

**ENTERPRISE COUNSEL GROUP**
        A Law Corporation

Office and P.O. Address 3 Park Plaza, Suite 1400 Irvine, CA 92614-8537 Telephone: (49) 833-8550 David A. Robinson, Esq. Benjamin P. Pugh, Esq.
Email: drobinson@ecg.law
Email: bpugh@ecg.law

*Attorneys for Plaintiff Applied Energetics, Inc.*

TO:    Joseph L. Francoeur, Esq.
        Tina C. Ma, Esq.
        Wilson Elser Moskowitz Edelman & Dicker, LLP
        *Attorneys for Stein Riso Mantel McDonough, LLP*
        150 East 42nd Street
        New York, New York  10017
        Telephone:  (212) 490-300
        Email:  joseph.francoeur@wilsonelser.com
                tma@tpglaws.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2019, I electronically filed the foregoing Second Amended Complaint with Exhibits, dated May 13, 2019, with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the following:

Joseph L. Francoeur, Esq.
Tina C. Ma, Esq.
Wilson Elser Moskowitz Edelman & Dicker, LLP
*Attorneys for Stein Riso Mantel McDonough, LLP*
150 East 42nd Street
New York, New York  10017
Telephone:  (212) 490-3000
Email:  joseph.francoeur@wilsonelser.com
         tma@tpglaws.com

_____*s/Jonathan B. Fellows*_____
Jonathan B. Fellows (Jf8629)

3346351.1 5/13/2019